IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.41 ACRES OF LAND, more or less, situated in the City of Alameda, Alameda County, State of California, and THE STATE OF CALIFORNIA, acting by and through its Department of Parks and Recreation, and the EAST BAY REGIONAL PARK DISTRICT,

    Defendants.
    /

No. C 14-01781 WHA

**ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT OF THE UNITED STATES AND DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this condemnation action, the United States, acting on behalf of the General Services Administration, seeks to condemn a portion of McKay Avenue in Alameda County. The State of California and the East Bay Regional Park District, defendants, oppose this condemnation. The United States has filed a motion for partial summary judgment, and defendants have jointly filed a cross-motion for summary judgment. For the reasons stated below, the motion of the United States is **GRANTED** and defendants' cross-motion is **DENIED**.

**STATEMENT**

The following undisputed facts are based on declarations submitted in support of the parties' motions and exhibits thereto, a joint submission of all parties in response to a request for

1  clarification following the filing of the motion for partial summary judgment of the
2  United States, and facts of which judicial notice is taken.

3      This action concerns the condemnation of McKay Avenue, which is in the City of
4  Alameda.  That street provides access to Crown Memorial Beach, the Alameda Federal Center,
5  and certain private properties from Central Avenue.  Here is an agreed-on map of the land in
6  question (Dkt. No. 76-1):

23      Our story began in 1961, when the United States conveyed over ninety acres of land,
24  including McKay Avenue, to California and retained 7.6 acres on the west side of McKay
25  Avenue for a federal government office facility, now known as the Alameda Federal Center.
26  The United States also reserved an easement in McKay Avenue for utility-access and street-use
27  purposes.  The utility-access easement was reserved "as long as may be required to serve
28  Government-owned property."  The street-use easement did not include that limitation.  As of

2008, the United States Department of Agriculture was the tenant of the Alameda Federal Center and occupied the full 7.6-acre plot. Crown Beach, the parcel of land on the east side of McKay Avenue across from the Alameda Federal Center, was and remains a state-owned beach and park. East Bay operated and still operates that park pursuant to an agreement with California. East Bay also operated and still operates McKay Avenue pursuant to that agreement (Defs.' Joint App. of Evid. Exhs. C, D, P; Dkt. No. 76-2, Corrected 1969 Quitclaim Deed).

Through the federal real property relocation program, created as part of an appropriations act in 1987, GSA has been authorized to relocate federal agencies to minimize the government's footprint, provided the estimated proceeds from the sale of vacated space exceed the estimated costs of relocation. Pub. L. 100-202, 101 Stat. 1329, 1329-409 (1987). In 2008, GSA and USDA decided to consolidate USDA's operations at the Alameda Federal Center, specifically by moving all operations into the northern half of it, vacating the southern half and making the latter eligible for sale. This relocation occurred in 2009. The cost of relocation to the northern parcel was estimated to be well below the estimated sale proceeds of the southern parcel. GSA prepared to sell the southern parcel, which it designated "Neptune Pointe" (Defs.' Joint App. Exhs. A, P–R).

Before the consolidation, the primary driveway for the entire lot from McKay Avenue was located on the southern parcel. So, in 2008, GSA began to widen a secondary driveway located on the northern parcel so it could manage traffic flow after selling the southern parcel. This construction required the removal of several trees, cutting the curbs surrounding the driveway, and moving a fire hydrant. Upon learning of this construction, East Bay demanded that GSA cease this work, arguing that the construction occurred in portions of the street owned by California and leased by East Bay and asserting that GSA required an "encroachment permit" in order to continue its construction (Charlene Larson Decl. ¶¶ 5–9; Liz Musbach Decl. Exh. F).

GSA told East Bay that it believed it had no legal obligation to seek an encroachment permit because the easement reserved to the United States permitted improvements and repairs on that street in order to support the continued use of that easement. GSA also informed

3

East Bay that it planned to sell the southern parcel of the Alameda Federal Center (Larson Decl. Exh. A).

East Bay nevertheless insisted that GSA get an encroachment permit despite the easement. East Bay further informed GSA that it interpreted the utility-access easement in McKay Avenue such that it would only remain in effect as long as the lot serviced by the easement was owned by the federal government and any private buyer of any portion of the property would not enjoy that easement. GSA replied that the utility-access easement was appurtenant to the property and would run with the land in the event of a sale (Larson Decl. ¶¶ 6–8; Defs.' Joint App. Exh. B; Musbach Decl. Exhs. H, I).

In 2011, GSA publicly advertised an auction to sell Neptune Pointe. The invitation for bids stated the property was for sale "as-is" and "with all faults," but noted that access to the property was via McKay Avenue, "which [was] under the primary control of the East Bay Regional Park District." The invitation further notified bidders that the utility infrastructure would also be conveyed "as-is" and encouraged bidders to contact utility providers, the City of Alameda, and East Bay for further information and to secure the necessary access (Defs.' Joint App. Exh. B).

A representative of STL Company, LLC, contacted GSA to inquire about Neptune Pointe but expressed concern about access to the property and utility access via McKay Avenue. Nonetheless, STL submitted the winning bid. East Bay submitted a losing bid. In the ensuing negotiations between GSA and STL, STL maintained its concerns about street use and utility access. In October 2011, GSA and STL entered into a contract for the sale of Neptune Pointe. Over the following three years, STL requested, and GSA granted, thirty-three extensions on payment installments, some of which were based on obstacles STL faced in securing street use and utility access from East Bay (Clark Van Epps Decl. Exhs. A–M; Musbach Decl. ¶ 13).

In April 2014, the United States initiated proceedings to condemn McKay Avenue by filing the complaint herein pursuant to FRCP 71.1. It took title to that land by concurrently filing a declaration of taking also herein pursuant to 40 U.S.C. 3114. The United States condemned McKay Avenue and its western sidewalk in fee simple, though it reserved an

4

easement for passage, operation, and utility access in favor of California, East Bay, and other adjoining land owners. The United States also condemned an easement in the eastern sidewalk of McKay Avenue for passage and utility access appurtenant to both the northern and southern parcels (Amd. Decl. Taking, Schedule A).

In July 2014, following a series of re-zoning decisions, the City of Alameda re-zoned Neptune Pointe to "Open Space." City of Alameda, Ordinance No. 3102 (2014) (of which judicial notice is taken). This re-zoning decision was approved by way of a citizens' petition, and as such, may only be amended or repealed by a majority vote of the citizens of Alameda. *Ibid.*; City of Alameda, Ordinance No. 2014-687 (2014) (of which judicial notice is taken).

In August 2014, STL contacted GSA seeking to terminate its contract for the purchase of Neptune Pointe and alleged that GSA had failed to provide legal access to the property. In September, GSA informed STL that it was in default of its contract to purchase Neptune Pointe and gave it the opportunity to cure its default. Although GSA disputed that it had any obligation to provide STL with access to the property, GSA terminated its contract with STL in October 2014 (Van Epps Decl. Exhs. K–M).

East Bay and California have opposed condemnation. Both sides now move for summary judgment on two issues: (1) whether the condemnation of McKay Avenue in fee simple constitutes a public use, and (2) whether GSA, acting on behalf of the United States, has statutory authority to condemn McKay Avenue. This order follows full briefing and oral argument.

**ANALYSIS**

The United States enjoys the power of eminent domain within its borders but that power is limited. A condemning official must have statutory authority to condemn the property in question for the asserted use, and the asserted use must "qualify as a 'public use' under the Takings Clause of the Fifth Amendment." *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 949–50 (9th Cir. 2008). Additionally, the decision to condemn may be set aside if the rationale for the taking is arbitrary, capricious, or in bad faith. *United States v. Carmack*, 329 U.S. 230, 244, 247–48 (1946).

5

### 1. PUBLIC PURPOSE.

The government's exercise of its eminent domain power must be "rationally related to a conceivable public purpose." *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 230 (1984). The United States has stated that the public use that justifies the condemnation of McKay Avenue is "the conveyance or outlease of all or a portion of the [7.6 acre lot that includes Neptune Pointe and the consolidated Alameda Federal Center] . . ." (Amd. Decl. Taking ¶ 2). Defendants argue that clearing title for the hypothetical future conveyance of Neptune Pointe is not a permissible public use.

In *United States v. 1.33 Acres, Situated in County of San Luis Obispo*, 9 F.3d 70, 72–74 (9th Cir. 1993), our court of appeals found that the condemnation of an easement to secure marketable title in surplus federal property should be treated as part of a "single integrated effort" to dispose of the surplus property. In *Southern Pacific Land Co. v. United States*, 367 F.2d 161, 163 (9th Cir. 1966), the United States was permitted to condemn mineral rights underlying a parcel in order to increase the value of that parcel's future sale. "Advantageous liquidation of a Government's investment is a legitimate consideration in determining the estate to be taken." *Ibid.*

*United States v. 1.33 Acres*, 9 F.3d at 73, is not exactly on point because that decision evaluated condemnation to clear title on a sale that had already occurred. Interpreting the condemnation authority with liberality and incorporating the consideration of advantageous liquidation, however, this order finds that GSA's single integrated effort to dispose of surplus property is rationally related to a conceivable public purpose though no buyer is yet lined up.

Defendants argue that the taking of McKay Avenue is not rationally related to disposing of Neptune Pointe because GSA does not yet have a formalized plan for Neptune Pointe. Defendants cite to *Kelo v. City of New London, Connecticut*, 545 U.S. 469, 478 (2005), for the proposition that a valid taking requires a "'carefully considered' development plan." But defendants' argument misstates the role of the development plan in that decision. There, the question was whether the taking was for a "legitimate" versus "illegitimate" purpose. The detailed development plan was used merely as evidence of the legitimacy of the

6

government's purpose. Here, the legitimacy of GSA's plan has been shown by GSA's prior attempt to sell the land, which fell through in part because it could not convey access for street use or utilities via McKay Avenue, so no carefully considered development plan is necessary. Looking forward, it is reasonable to expect the United States to want to resolve the access issue even before it formulates a further concrete plan for the disposal of Neptune Pointe.

Defendants' best point is that Neptune Pointe was re-zoned as "open space" through a citizens' initiative, which can only be reversed by a public vote. This reduces the likelihood that a developer would ever want to purchase Neptune Pointe and increases the possibility the parcel will, if ever sold, have to be used for open space. These considerations, in turn, reduce the likelihood of a GSA sale and diminish the sale-proceeds factor for purposes of the cost-to-proceeds analysis (although the relocation has already occurred). Nevertheless, the Court remains of the view that the government is entitled to clear up this thicket of problems one at a time and, right now, it is trying to clear up the problem of access to the parcel via McKay Avenue. It does not have to clear up the problems in the order desired by the opposition, namely it does not have to first solve the problem of finding a buyer.[1]

The fact that GSA has not yet designated Neptune Pointe "surplus" within the meaning of its disposal authority is also of no moment. Defendants point to no authority requiring that such a designation must precede actions taken in preparation for a disposal.

It is true that GSA may have miscalculated the ratio of the cost to relocate USDA operations at the Alameda Federal Center versus the proceeds from the sale of Neptune Pointe, which was supposed to be a favorable ratio prior to any relocation and sale of surplus land. Pub. L. No. 100-202, 101 Stat. 1329, 1329–409 (1987). Specifically, GSA's appraisal of Neptune Pointe was based on its interpretation of the street-use and utility-access easements reserved by the United States in McKay Avenue in 1961, which East Bay subsequently disputed

---

[1] Defendants argue that GSA's decisions to take McKay Avenue in fee simple (rather than just an easement) and to sell Neptune Pointe to a private developer (rather than to defendants) were arbitrary and capricious. These arguments relate to the necessity of this condemnation for the stated purpose, which is non-justiciable. *United States v. 80.5 Acres of Land, More or Less, in Shasta County, State of California*, 448 F.2d 980 (9th Cir. 1971). Defendants also argue that clearing title is pretext for illegitimate purposes, but that purpose is not so suspicious or implausible that it should be set aside as pretextual. *Kelo*, 545 U.S. at 491 (Justice Anthony Kennedy, concurring).

7

1  and continues to dispute. Had GSA adopted East Bay's interpretation, namely that any
2  construction on McKay Avenue would require an encroachment permit regardless of the
3  street-use easement and that the utility-access easement would not run with the land, GSA
4  would likely have reduced its estimate of the sale proceeds, which could have affected the
5  cost-to-proceeds ratio. On the other hand, the relocation has already occurred, so half of the
6  process has been accomplished and Neptune Pointe is now vacant. This order holds, contrary
7  to defendants, that the determination of whether or not the ratio was favorable when the project
8  began (or remains favorable now) is committed to agency discretion and is not subject to judicial
9  review. 5 U.S.C. 701(a)(2); 40 U.S.C. 121(a); Executive Order No. 13327, 69 Fed. Reg. 5897
10 (2004). Defendants do not argue that GSA failed to follow any required procedure in seeking
11 the appraisal of Neptune Pointe or that any aspect of that appraisal was arbitrary or capricious.[2]

12 This order finds that the condemnation of McKay Avenue is rationally related to the
13 conceivable public purpose of the advantageous liquidation of Neptune Pointe.

### 2. STATUTORY AUTHORITY.

15 To initiate an action in condemnation, the United States must file a complaint in a court
16 with jurisdiction over the proceeding. FRCP 71.1(c). That complaint must state: (1) the
17 authority for the taking, (2) the uses for the property to be taken, (3) a description of the
18 property, (4) the interest to be acquired, and (5) the owners of the property to be taken, who are
19 named as defendants in the action. *Ibid.* Additionally, the United States may take title to the
20 property to be condemned prior to judgment by filing a statutory creature called a declaration of
21 taking with the court presiding over the condemnation proceedings. 40 U.S.C. 3114(b). That
22 filing may be done with the initial petition "or at any time before judgment." *Id.* at 3114(a). If
23 the United States chooses to file a declaration of taking, it must also include, *inter alia*, a
24 statement of the authority for the taking. *Id.* at 3114(a)(1).

---

[2] Defendants' best decision on this point is easily distinguished. In *Maiatico v. United States*, 302 F.2d 880, 884–86 (D.C. Cir. 1962), GSA was found to lack authority to condemn because it unambiguously over-stepped non-discretionary bright-line limitations on the scope of its power to acquire property. Specifically, GSA failed to submit a required prospectus for the acquisition of a property, it never received approval for the project for which the property was to be taken, and the property condemned was outside the geographic bounds of GSA's authority. *Id.* at 884. Here, GSA has not failed to meet any such non-discretionary requirements.

8

The United States filed its first complaint and declaration of taking herein in April 2014. It amended its complaint and declaration of taking in December, but did not seek leave for those amendments. As amended, the complaint and declaration of taking include citations to five sources of authority for the condemnation of McKay Avenue:

1. The statute stating the requirements for a declaration of taking, 40 U.S.C. 3114;
2. A statute permitting the GSA administrator to condemn real estate, 40 U.S.C. 581(c)(1);
3. A statute allowing for the disposal of surplus property, 40 U.S.C. 543;
4. A series of appropriations acts authorizing funding for the real property relocation program, Pub. L. No. 100-202, 101 Stat. 1329, 1329–409 (1987); Pub. L. No. 100-440, 102 Stat. 1721, 1738–39 (1988); 101-306, 103 Stat. 783, 800–01 (1989); Pub. L. No. 101-509, 104 Stat. 1389, 1411 (1990); Pub. L. No. 102-141, 105 Stat. 834, 854 (1991); and
5. The appropriations act supplying the funds to be paid for just compensation for the condemnation of McKay Avenue, Continuing Appropriations Act, 2014, Pub. L. No. 113-46, 127 Stat. 558, 558 (2014).

Defendants argue that the cited statutes do not authorize GSA's condemnation for the purpose of enhancing the sale value of land to be disposed of as surplus property. Defendants also argue that the United States improperly amended its declaration of taking to include its disposal authority, which had not been cited in its first declaration of taking. Lastly, defendants argue that GSA's errors in seeking appraisal of Neptune Pointe deprived it of authority to consolidate the USDA operations at the Alameda Federal Center under the real property relocation program in the first place. These objections are misplaced, as now explained.

**A.  Authority to Condemn for Disposal of Surplus Property.**

The United States cites Section 543 of Title 40 of the United States Code as a source of GSA's authority to dispose of surplus property. It provides, in relevant part: "The agency may execute documents to transfer title or other interest in the property and *may take other action it*

9

1  *considers necessary or proper* to dispose of the property under this chapter." *Ibid.* (emphasis
2  added). Defendants argue that this provision does not authorize condemnation in order to clear
3  title on surplus property. This is incorrect.

4  GSA's authority to dispose of surplus property includes the condemnation of property
5  necessary or proper to secure marketable title in the property to be disposed. *United States v.*
6  *1.33 Acres, Situated in County of San Luis Obispo*, 9 F.3d 70, 73 (9th Cir. 1993). In *United*
7  *States v. 1.33 Acres*, GSA relied on its disposal authority in 40 U.S.C. 484(c) (1988). That
8  provision was re-codified as Section 543 in 2002, and contained nearly identical "necessary or
9  proper" language. Defendants offer no meaningful distinctions between the sources of authority
10 considered in that decision and those cited by the United States in its amended declaration of
11 taking. Accordingly, GSA has the statutory authority necessary to condemn McKay Avenue.

### B. Amendment of the Declaration of Taking.

13 In November 2014, the undersigned denied the motion of the United States seeking to
14 strike defendants' affirmative defense that GSA lacked statutory authority (Dkt. No. 45).
15 The motion to strike was denied because the United States failed to cite a disposal-of-property
16 statute in its first declaration of taking. In December, the United States amended its complaint
17 and its declaration of taking to include a citation to GSA's disposal authority under 40 U.S.C.
18 543 and to include the eventual sale of Neptune Pointe in its stated purpose for the taking.
19 The United States did not seek leave for either amendment.

20 In order to take effect, a declaration of taking must be filed "with the petition [seeking
21 approval of the taking] or *at any time before judgment* . . . ." 40 U.S.C. 3114 (emphasis added).
22 Though the United States amended its declaration of taking long before judgment herein,
23 defendants argue the amendment was improper, claiming that an amendment to a declaration
24 of taking without leave is only proper to correct an inadvertent error.

25 In support of this argument, defendants first cite *United States v. 1997.66 Acres of Land,*
26 *More or Less in Polk County, Iowa*, 137 F.2d 8, 14 (8th Cir. 1943), without any explanation for
27 its relevance to this dispute (Def. Mot. at 19 n.7). There, a district court was found to have
28 abused its discretion by refusing to grant the government leave to amend its declaration of taking

10

to reduce its estimate of just compensation prior to disbursing that sum to the land-owner. That decision noted that if the amendment had affected the land-owner's rights, such as by reducing a payment already disbursed, or if it had been made in bad faith, the district court might have had discretion to refuse such an amendment, but those were not the facts considered in that decision. Nor here.

Defendants also attempt to manufacture a rule that an amendment to a declaration of taking without leave is only appropriate to correct "inadvertent error" (Def. Reply at 10). In *United States v. 76.208 Acres of Land More or Less, in the Township of Horsham, County of Montgomery, Commonwealth of Pennsylvania*, 580 F. Supp. 1007, 1009 (E.D. Pa. 1983) (Judge Louis Bechtle), the government was granted leave to amend its declaration of taking in order to correct an inadvertent omission of a limitation of the scope of the easement taken in the description of the property in its declaration of taking. That decision distinguished several prior decisions that rejected amendments altering the estate condemned absent inadvertent error; it did not go so far as to require inadvertent error for *all* amendments to a declaration of taking, whether or not leave was sought.

The United States was under no obligation to file a declaration of taking prior to judgment. 40 U.S.C. 3114(a). Since the United States could have filed a declaration later rather than earlier, it should be permitted to amend an earlier-filed declaration unless some point of prejudice has surfaced in the interim. Here, no such point of prejudice has surfaced. All that was added was a citation of statutory authority for the substantive action. Accordingly, no leave was necessary for the United States to amend its declaration of taking to include a disposal authority.

**CONCLUSION**

To the extend stated above, the motion for partial summary judgment of the United States is **GRANTED** and California and East Bay's joint cross-motion for summary judgment is **DENIED**. The United States requested that the Court take judicial notice of pending litigation relating to

the zoning of Neptune Pointe. This order does not rely on that litigation, so that request is **DENIED AS MOOT**. The issue of just compensation remains to be resolved.

**IT IS SO ORDERED.**

Dated: June 12, 2015.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

12